## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WEST CHESTER AREA     :
SCHOOL DISTRICT,      :
      Plaintiff     :
          :
   v.         :   No.
          :
S.O., by and through her parents,   :
D.O. and C.O., and      :
D.O. and C.O., individually,    :
      Defendants   :

### COMPLAINT

1.  Plaintiff is the West Chester Area School District ("West Chester"), a Pennsylvania public school district organized under the laws of the Commonwealth of Pennsylvania and the Pennsylvania School Code, and local educational agency ("LEA") under the IDEA[1] with central offices located at 782 Springdale Drive, Exton, Pennsylvania 19341.

2.  Defendant S.O. is a minor student currently enrolled at a private school.

3.  Defendants D.O. and C.O. ("Parents"), are minor student's parents and reside within West Chester boundaries.[2]

4.  This Court has federal question jurisdiction, 28 U.S.C. § 1331, and specific grant of jurisdiction under the IDEA, 20 U.S.C. § 1415(i)(2).

5.  Venue is proper in the Eastern District pursuant to 28 U.S.C. § 1391(b)(1), as the parties reside within and the causes of action arose within this district.

6.  The claims subject to this Complaint have been fully exhausted at the administrative level through a Ruling on Motion for Pendency dated September 5, 2019 and a

---

[1] The Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), P.L. 108-446, 118 Stat. 2647-2808 (Dec. 3. 2004), 20 U.S.C. §§ 1401-1482.

[2] West Chester refers to the family by initials as the underlying matter involves a minor student.

final Hearing Officer decision dated October 27, 2019. A redacted copy of the Ruling on Motion for Pendency ("Ruling") is attached as "Exhibit A." A redacted copy of the Hearing Officer's Final Decision and Order ("HOD") is attached as "Exhibit B."

7.     First, West Chester seeks to reverse the Hearing Officer's Ruling finding that the private school is S.O.'s pendent placement. Second, West Chester seeks to reverse the HOD determining that West Chester denied S.O. a free appropriate public education ("FAPE") by failing to (a) evaluate S.O. over the summer 2019, and (b) provide S.O. with an appropriate or comparable IEP. Third, West Chester seeks to reverse the HOD ordering relief in the form of tuition reimbursement for the private school in which S.O. is enrolled. Fourth, West Chester seeks to reverse the Hearing Officer's decision not to include the settlement agreement between Parents and the student's prior LEA, Pennsylvania Leadership Charter School, into evidence.

8.     Since Friday, June 7, 2019, West Chester is the LEA responsible for providing a FAPE to S.O. under federal and state law.

9.     S.O. is a disabled student identified under the educational disability categories of Specific Learning Disability, Other Health Impairment, and Emotional Disturbance and who by reason thereof, needs special education and related services pursuant to the IDEA. 20 U.S.C. § 1401(3)(A) (defining child with a disability); 34 C.F.R. 300.8(a)(1) (same).

10.     S.O. has educational needs pertaining to reading, math, and writing.

11.     S.O. was enrolled at the Pennsylvania Leadership Charter School ("Charter School") for the prior four school years, 2015-2016 through conclusion of the 2018-2019 school year.

12.     For the 2018-2019 school year, S.O. attended The Concept School ("Concept") funded by the Charter School *in lieu of FAPE* per a settlement agreement reached between the

Parents and the Charter School.  The Charter School IEP, dated September 5, 2018, states that S.O. "will attend the Concepts School in lieu of FAPE per settlement agreement" from September 5, 2018 through September 3, 2019.

13.     The Settlement Agreement and Release dated July 27, 2018 between the Parents and the Charter School conditions, in part, the funding of S.O.'s tuition at Concept for the 2018-2019 school year on the Parents withdrawing S.O. from the Charter School at the end of the 2018-2019 school year.  (Ex. A at 1 – 2).

14.     On July 17, 2019, West Chester and Parents met for a registration meeting.

15.     On July 18, 2019, one day after the registration meeting, Parents notified West Chester that they were unilaterally placing S.O. at Concept for the 2019-2020 school year and seeking public funding for that placement.

16.     On August 9, 2019, Parents filed a special education Due Process Complaint after receiving a Notice of Recommended Educational Placement ("NOREP") denying Parents' request for payment for Concept and proposing to honor the Charter School IEP at West Chester's Henderson High School until a new West Chester IEP is written.

17.     The Office for Dispute Resolution ("ODR"), the Commonwealth's designated special education due process administrative hearing coordinator, 22 Pa. Code. § 14.162(p), docketed the matter as ODR No. 22560/19-20 AS and assigned Linda Valentini as Hearing Officer.

18.     On August 22, 2019, Parents filed a Motion for Pendency asking the Hearing Officer to rule that pendency was at Concept and requiring West Chester to fund S.O.'s placement at Concept.

19.     On September 5, 2019, Hearing Officer Valentini found Concept to be S.O.'s pendent placement and ordered West Chester to fund S.O.'s placement at Concept.

20.     An evidentiary hearing was held on September 26, 2019.

21.     The Hearing Officer issued her Final Decision and Order on October 27, 2019.

22.     The Hearing Officer erred by (a) making multiple factual errors contrary to the evidence in record and (b) violating established legal standards to determine the IDEA intrastate transfer provisions do not apply to S.O., thereby incorrectly finding: Concept was S.O.'s pendent placement; West Chester was required to evaluate S.O. over the summer; and West Chester's offer of comparable services was inappropriate.

23.     West Chester appeals both the Hearing Officer's Ruling on Motion for Pendency and her Final Decision and Order, seeking full reversal of the Hearing Officer's Ruling and final Decisions and Orders, and a finding that West Chester properly followed the IDEA intrastate transfer provisions and offered an appropriate program and placement, refuting the need for tuition reimbursement to Parents.

### Count I:  INDIVIDUALS WITH DISABILITIES EDUCATION ACT - PENDENCY - 20 U.S.C. § 1414(d)(2)(C)(i)(1)

24.     West Chester incorporates the allegations set forth above as if fully set forth hereafter.

25.     The Hearing Officer issued a Ruling on Parents' Motion for Pendency dated September 5, 2019 granting pendency.

26.     The Hearing Officer commits errors of fact and law in applying the IDEA's pendency or stay-put provision, 20 U.S.C. § 1415(j), instead of IDEA's intrastate transfer provision, 20 U.S.C. § 1414(d)(2)(C)(i)(1), when S.O. transferred to West Chester from the Charter School.

27.     The intrastate transfer provision establishes when a student's parents unilaterally transfer from one school district in a state to another, "the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law. 20 U.S.C. § 1414(d)(2)(C)(i)(1).

28.     Charter School provided S.O. with an IEP dated September 4, 2018, which was still in effect when West Chester created an IEP for S.O. with comparable supports and services.

29.     The Hearing Officer commits errors of fact and law by finding and concluding that the private Settlement Agreement and Release between Parents and the Charter School required West Chester to fund tuition at Concept as S.O.'s pendent placement.

i)      The Hearing Officer erroneously elevates the private settlement agreement and release above federal law.

ii)     The Hearing Officer erroneously ties a federally-mandated intrastate transfer process to the private settlement agreement and release.

iii)    The Hearing Officer erroneously fails to address any IEP and placement process apart from the Parents and Charter School's private settlement agreement and release.

30.     The Hearing Officer erred when deciding S.O.'s placement using the IDEA's regulations providing for maintenance of the "then-current educational placement", 20 U.S.C. § 1415(j) (the pendency or stay-put provision), instead of the intrastate transfer provision of the IDEA.

31.     The Court of Appeals for the Third Circuit stated explicitly and emphatically that there is no right to interim relief in the form of a pendency order against the receiving school district in an intrastate transfer scenario because the stay-put provision of the IDEA does not apply. *J.F. v. Byram Twp. Bd. Of Educ.*, 629 F. App'x 235, 237, 238 (3d Cir. 2015.)

32.     In contrast to Third Circuit instructions in *Byram*, the Hearing Officer committed error of fact and law in finding and concluding that Concept was S.O.'s pendent placement because it was "the Student's last-approved and operative placement when this hearing was requested." (Ex. A at 5).

## Count II:  INDIVIDUALS WITH DISABILITIES EDUCATION ACT - INITIAL EVALUATION - 20 U.S.C. § 1414(d)(2)(C)(i)(1)

33.     West Chester incorporates the allegations set forth above as if fully set forth hereafter.

34.     The Hearing Officer issued a Final Decision and Order dated October 27, 2019, requiring West Chester to reimburse Parents for S.O.'s tuition at Concept.  HOD at 17.

35.     For the reasons set forth herein, the Hearing Officer commits errors of fact and law that requires reversing the Decision and Order.

36.     The Hearing Officer erred as a matter of fact and law by holding West Chester liable for not evaluating S.O. during the summer months between the end of the 2018-2019 spring term and the start of the 2019-2020 fall term.

37.     The Hearing Officer erred in concluding S.O. required placement at Concept prior to West Chester completing an evaluation and developing an IEP based upon that evaluation.

38.     Until West Chester completes an evaluation and develops a new IEP consistent with federal and state law, the only issue ripe for adjudication was West Chester's compliance with IDEA's intrastate transfer provision.

39.     Until West Chester completes an evaluation and develops a new IEP based upon that evaluation, there was no "matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education", 20 U.S.C. § 1415(b)(6), to adjudicate and the Hearing Officer had no jurisdiction to decide such issues.

40.     Any finding and conclusion beyond compliance with the IDEA's intrastate transfer provision, including the finding that West Chester had to either evaluate S.O. expeditiously and/or during the summer, is erroneous.

41.     The Hearing Officer committed errors of fact and law in applying the IDEA's evaluation provision, 20 U.S.C. § 1414; 22 Pa. Code § 14.123(b), albeit incorrectly, instead of the IDEA's intrastate transfer provision, 20 U.S.C. § 1414(d)(2)(C)(i)(1), when S.O. transferred to West Chester from the Charter School.

42.     The IDEA requires a public agency to conduct an evaluation before the initial provision of special education and related services are offered to a child with a disability.  20 U.S.C. § 1414(a)(1)(A).  The evaluation must be completed within 60 days of receiving parental consent for the evaluation or within such timeframe as a state establishes. 20 U.S.C. § 1414(a)(1)(C)(i)(I).  Pennsylvania establishes an exception to the IDEA's 60 day rule by not counting in the 60 day timeline the days "from the day after the last day of the spring school term up to and including the day before the first day of the subsequent fall term."  22 Pa. Code § 14.123(b).  In other words, a public agency is not required to evaluate during the summer months and, therefore, cannot be liable if it does not conduct an evaluation during the summer months.

43.     The Hearing Officer committed errors of fact and law in finding and concluding that West Chester was obligated to fund placement at Concept because West Chester did not evaluate S.O. expeditiously or during the summer in an intrastate transfer proceeding.

44.     Even if it is determined that the intrastate transfer provision is not applicable here, the Hearing Officer commits errors of fact and law in finding that West Chester was obligated to fund placement at Concept because West Chester did not evaluate S.O. expeditiously and/or during the summer, in contrast to Pennsylvania law.

### Count III:  INDIVIDUALS WITH DISABILITIES EDUCATION ACT - COMPARABLE SERVICES - 20 U.S.C. § 1414(d)(2)(C)(i)(1)

45.     West Chester incorporates the allegations set forth above as if fully set forth hereafter.

46.     The Hearing Officer issued a Final Decision and Order dated October 27, 2019, requiring West Chester to reimburse Parents for S.O.'s tuition at Concept.

47.     The Hearing Officer commits errors of fact and law that requires reversing her Decision and Order.

48.     At the July 17, 2019 registration meeting between West Chester and Parents, the Parents gave West Chester an Independent Educational Evaluation and a 2016 IEP from the Charter School.

49.     West Chester advised Parents it would implement the IEP provided by the Parents from the Charter School until its evaluation was completed and if Parents had any questions regarding the IEP or program, West Chester would meet with them to discuss any concerns.

50.     The Hearing Officer committed errors of fact and law in applying the IDEA's FAPE requirement, 20 U.S.C. § 1414 *et seq.*, albeit incorrectly, instead of the IDEA's intrastate transfer provisions, 20 U.S.C. § 1414(d)(2)(C)(i)(1), when S.O. transferred to West Chester from the Charter School before the end of the 2018-2019 school year.

51.     The IDEA states in situations where a child with a disability "transfers school districts within the same academic year, who enrolls in a new school, and who has an IEP that

was in effect in the same State, the local education agency shall provide such child with a free appropriate public education, including *services comparable* to those described in the previously held IEP, in consultation with the parents until such time as the local education agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law." 20 U.S.C. § 1414(d)(2)(C)(i)(1).

52.    The Hearing Officer erred, due to lack of jurisdiction, in addressing any aspect of West Chester's obligation to provide a FAPE other than as related to IDEA's mandated intrastate transfer requirements.

53.    The Hearing Officer erred as a matter of fact and law by making any finding about S.O.'s educational needs apart from the Charter School's intrastate transfer IEP.

54.    The Hearing Officer concluded that S.O. should be educated at Concept without West Chester first completing an evaluation and developing an IEP in accordance with Pennsylvania standards.

55.    Until West Chester completes an IDEA evaluation and develops a new IEP consistent with federal and state law, the only issue ripe for adjudication during the due process hearing was West Chester's compliance with IDEA's intrastate transfer provision.

56.    Until West Chester completes an IDEA evaluation and develops a new IEP, there is no "matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education," 20 U.S.C. § 1415(b)(6), to adjudicate and the Hearing Officer had no jurisdiction to decide such issues.

57.    The Hearing Officer's limited statutory grant of adjudicatory authority/subject-matter jurisdiction is limited and not waivable.

58.    Any finding and conclusion beyond compliance with the intrastate transfer provision, including finding that S.O.'s placement should be at Concept in order to receive FAPE is erroneous.

59.    If a parent obtains an independent educational evaluation ("IEE") and shares it with the public agency, the public agency must *consider* it in any decision regarding FAPE for the student. 34 C.F.R. § 300.502 (c)(1).

60.    The intrastate transfer provision requires that a school district rely only on the previously held IEP, in consultation with the parents, to offer comparable services.

61.    An IEE is not included under the intrastate transfer provision, thus the Hearing Officer erred as a matter of law by concluding that West Chester should have used the IEE to prepare S.O.'s transfer IEP rather than basing the IEP on the previously held IEP at the Charter School as required by the IDEA.

62.    The Hearing Officer also erred by determining West Chester's intrastate transfer IEP did not provide comparable services to S.O.'s previously held IEP at the Charter School.

63.    The IDEA's intrastate transfer provision requires West Chester, in "consultation with the parents", to implement services comparable to those in the already existing intrastate transfer IEP.

64.    West Chester informed Parents it would base S.O.'s schedule on her previous IEP from the Charter School and if Parents wanted to discuss the IEP, a meeting would be scheduled.

65.    The Hearing Officer erroneously applied a much more rigorous substantive needs-based program and placement analysis where the IDEA's intrastate transfer provisions merely require implementation of the intrastate transfer IEP until such time as West Chester can appropriately evaluate and develop its own IEP.

66.     The Hearing Officer wrongly substitutes her own personal judgement for those of West Chester's educational professionals, among others:

     i)    Where the Hearing Officer simply replaces her own preferences for the legitimate decisions made by West Chester staff after consultation with the Parents; and

    ii)    By finding and concluding that West Chester, despite knowing the Parent's preference for placement at Concept, was required to conduct more investigation and discussions before offering comparable services to the previously held IEP.

67.     The Parents failed to show West Chester did not implement the IDEA's intrastate transfer requirements.  Rather, the evidence shows West Chester complied with the intrastate transfer requirements.

68.     Because the only issue ripe for decision was West Chester's compliance with the IDEA's intrastate transfer provision, the Hearing Officer erroneously exceeded the limited issue and, going beyond implementation of IDEA's intrastate transfer rules, decided without jurisdiction that S.O. requires placement at Concept regardless of the intrastate transfer IEP and faulted West Chester for doing that which the IDEA requires – relying on the previously held IEP from the Charter School.

69.     The Hearing Officer committed an error of law in holding West Chester liable for the prior LEA's failure to include updated data in its operative IEP for the 2018-2019 school year.

## Count IV: INDIVIDUALS WITH DISABILITIES EDUCATION ACT - EXCLUDED EVIDENCE - 20 U.S.C. 1415(h)(2)

70.     West Chester incorporates the allegations set forth above as if fully set forth hereafter.

71.     Without conducting any evidentiary hearing, on September 5, 2019, the Hearing Officer issued a ruling on the Motion for Pendency where she ordered Concept is Student's placement during the pendency of the special education administrative hearing. (Ex. A at 6).

72.     The Hearing Officer considered the Settlement Agreement and Release between Parents and the Charter School as a basis for her decision.

73.     The Hearing Officer refused to permit the Settlement Agreement and Release to be entered into evidence or testimony to be taken regarding the Settlement Agreement and Release during the evidentiary hearing on September 26, 2019, which was the basis for the Final Decision and Order dated October 27, 2019.

74.     The Hearing Officer erred in fact and law by not permitting into evidence or permitting testimony relating to the Settlement Agreement and Release between the Parents and the Charter School in the evidentiary hearing on September 26, 2019.

75.     IDEA permits the right to present evidence and confront, cross-examine, and compel the attendance of witnesses.  20 U.S.C. § 1415(h)(2).

76.     The Hearing Officer erred by not permitting West Chester to enter into evidence the Settlement Agreement and Release between the Parents and the Charter School and by not permitting West Chester to confront and cross-examine Parents on the subject that S.O.'s attendance at Concept was the result of a settlement agreement and not by any determination of an IEP team that S.O. needed to attend Concept in order to receive FAPE.

**WHEREFORE**, Plaintiff, West Chester Area School District, respectfully requests that this Honorable Court:

      a.     Receive the administrative record;

      b.     Allow discovery and receive additional evidence;

      c.     Reverse the Hearing Officer's Ruling on Motion for Pendency Order dated September 5, 2019;

      d.     Reverse the Hearing Officer's Final Decision and Order dated October 27, 2019;

      e.     Find that the IDEA's intrastate transfer provisions apply to this matter and West Chester properly complied therewith;

      f.     Enter judgment in Plaintiff's favor and against Defendants; and

      g.     Award the costs of this action and such further relief in favor of Plaintiff as this court deems necessary and/or appropriate.

SWEET, STEVENS, KATZ & WILLIAMS, LLP

Date:   January 21, 2020    By:    _Jason D. Fortenberry_

Jason D. Fortenberry, Esquire – PA 311397
331 East Butler Avenue, P. O. Box 5069
New Britain, Pennsylvania 18901
(215) 345-9111

Counsel for Plaintiff,
West Chester Area School District

EXHIBIT A

PENNSYLVANIA
# SPECIAL EDUCATION HEARING OFFICER

### RULING ON MOTION FOR PENDENCY

RE: S█████ O███████ vs. West Chester Area School District

ODR#22560/19-20 AS

Introduction and Procedural History:

A due process hearing is scheduled for September 26, 2019. Both parties are represented by counsel.

The Parents initiated this due process hearing by filing a Complaint on August 9, 2019. On August 22, 2019 the Parents filed the instant Motion for Pendency. I invited the District to file a Response to the Motion within 5 business days; the District filed its Response on August 29, 2019. The Parents are seeking a ruling that Student's pendent placement for the 2019-2020 school year is The Concept School; the District disagrees. This pre-hearing order resolves the Parents' pendency motion.

For reasons detailed below, I grant the Parents' pendency motion.

Facts:

In the absence of an evidentiary hearing, I look to overlapping averments made by both parties and accept those as true. I also look to evidence submitted by the Parents with their motion and by the District in its response. The parties did not object to each other's evidence.

Student was enrolled in the Pennsylvania Leadership Charter School (PALCS) for the 2015-2016, 2016-2017, 2017-2018 and 2018-2019 school years. During each of those school years PALCS was Student's LEA.

On July 27, 2018, the Parents and PALCS entered into a settlement agreement and release. Under the pertinent terms of the agreement:

> The Student was enrolled in PALCS during the 2018-2019 school year.

> During the 2018-2019 school year, the Student attended The Concept School.

> PALCS agreed to pay the Student's tuition at The Concept School for the 2018-2019 school year.

> The Parents agreed to accept the tuition in lieu of FAPE.

1

The PALCS issued a Notice of Recommended Educational Placement (NOREP) on August 13, 2018 placing the Student in The Concept School for the 2018-2019 school year.

Regarding the NOREP, PALCS indicated its belief that the Student would receive a FAPE through its own services. Nevertheless, the NOREP offered placement at The Concept School because that is what the agreement required.

PALCS issued an IEP dated September 5, 2018 for implementation at The Concept School.

The Parents agreed to withdraw Student from enrollment at PALCS at the end of the 2018-2019 school year.

The Parents enrolled Student into the District on April 27, 2019 but due to a computer system upgrade at the District the Parents had to repeat the enrollment process and did so on June 2, 2019. The Parents' enrollment was for Student's 2019-2020 school year.

The Parents and the District met on July 17, 2019; the meeting was characterized by District counsel as a "registration meeting" and Parents' counsel emphasized this was "not an IEP meeting".

The Parents believed that at the July 17, 2019 meeting the District was not offering Student FAPE, and on July 18, 2019 they sent a letter asking the District to fund Student's placement at The Concept School for the 2019-2020 school year.

The District denied the Parents' request and on July 31, 2019 issued a NOREP offering to adopt and implement Student's then-current PALCS IEP, dated September 5, 2018, at a District high school until a new IEP could be developed. .

On August 9, 2019 the Parents through counsel filed their due process Complaint, wherein they invoked pendency at The Concept School.

Following an IEP meeting on August 23, 2019 the District offered a revised IEP, based on the PALCS IEP with some modifications, to be implemented until agreed upon reevaluations could be completed.

The Parents did not approve the NOREP.


Legal Basis for Pendency Considerations:

The IDEA requires the maintenance of a child's current educational placement during the pendency of due process proceedings. 20 U.S.C. § 1415(j) provides as follows:

> Except as provided in subsection (k)(4) [regarding disciplinary placements], during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be

2

placed in the public school program until all such proceedings have been completed.

This language is "unequivocal" and is "an absolute rule in favor of the status quo." *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996)(citations omitted).   The *Drinker* court explained that the "stay-put" provision represents Congress' policy choice that all disabled children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.

This pendency rule, also referred to as the stay-put provision, creates an "automatic preliminary injunction" designed to "protect handicapped children and their parents during the review process," by "block[ing] school districts from effecting unilateral change in a child's educational program." *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 82, 83 (3d Cir. 1996) citing *Drinker*. Pendency determinations are highly fact-specific. *See id.*

"Although [Parents] need not meet the traditional preliminary injunction standard, an injunction under the stay-put provision is only available where the LEA proposes or effects a change in a student's "educational placement."" *R.B. v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 756 (E.D. Pa. 2010) citing *Union Beach Bd. of Educ., 2009 U.S. Dist. LEXIS 108148, 2009 WL 4042715, at * 4.*

A student's last approved IEP often, but not always, is the student's pendent placement. It is also critical to determine what services the student was actually receiving at the time of the dispute, regardless of what is written in the IEP:

> The stay-put rule thus requires that the child's placement under the IDEA at the time a disagreement arises between the parents and the school district — what the statute terms the "then-current educational placement" — be protected while the dispute is pending. To determine that placement, this court has looked to the IEP "actually functioning when the 'stay put' is invoked." *Drinker*, 78 F.3d at 867 (citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625-26 (6th Cir. 1990)); *see also Susquenita*. The operative placement could be either a public school or a private school that the local district was financing to satisfy the requirement that every child be given a free, appropriate education. *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 118 (3d Cir. 2014), *cert denied Ridley Sch. Dist. v. M.R.*, 135 S. Ct. 2309 (2015).

Discussion

In this case, the last approved placement and the operative placement are the same. That placement is The Concept School. Under the standard set forth above, The Concept School is the Student's pendent or "stay-put" placement.

While the analysis truly is that straightforward, the District's counterarguments merit consideration. The District makes two counterarguments. First, the District argues that the

3

IDEA's intrastate transfer rules are controlling and yield a different result. Second, the District argues that the agreement between the Parents and PALCS is tantamount to fraud.

A school district's programming and placement obligations to a student within the IDEA's intrastate transfer provision at 20 U.S.C. §1414(d)(2)(C)(i)(1) is as follows:

> "In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law." [20 U.S.C. §1414(d)(2)(C)(i)(1); see also 34 C.F.R. § 300.323(e); 22 Pa. Code §14.102(a)(2)(xxvii) (requiring compliance with 34 C.F.R. § 300.323).]

Regarding the intrastate transfer rule, the District correctly summarizes requirements at 20 U.S.C. §1414(d)(2)(C)(i)(I). The District also correctly notes that neither "the IDEA nor its implementing regulations address a district's obligation to provide services to a student who transfers over the summer." Instead, the plain language of the intrastate transfer rule specifies that the rule applies only "when a child transfers within the same academic year." *Id.* As such, I find that the intrastate transfer rule does not apply to this case.

I hold that the IDEA's intrastate transfer provision does not apply to transfers that occur while school is not in session. My determination may be a matter of first impression, as my research revealed no other cases on point. I recognize, however, that reasonable minds could differ. It is possible to conclude that an academic year does not end until the next academic year starts. If that is true, the Student may have transferred within the same academic year, depending on what date controls the transfer. Therefore, despite my determination, I will consider the impact of the intrastate transfer rule as if it applies in this case.

Under the intrastate transfer rule, the District must provide services "in consultation with the Parents"[1] until it can develop its own IEP. In this case, however, the Parents dispute the appropriateness of the District's offered services regardless of whether those services were developed through the regular IEP process or through the intrastate transfer process. Their due process request triggers the IDEA's pendency rule, which supersedes the IDEA's intrastate transfer rule.

At most, the intrastate transfer establishes what services the District was obligated to offer in the short term upon the Student's enrollment. As such, the intrastate transfer rule relates to the appropriateness of the District's pre-IEP offer upon transfer. In contrast, the Student's pendent placement has nothing to do with appropriateness. The appropriateness of the District's offer, under typical IDEA analysis or under the intrastate transfer rule, is not a factor used to determine pendency. The operative or last-approved placement is completely controlling.

---

[1] The District argues that "consultation" does not require an IEP team meeting. I make no determination about that in this order.

Regarding fraud, the sequence of events leading up to the Student's enrollment in the District raises an eyebrow. The agreement required the Parents to dis-enroll the Student from PALCS at the end of the 2018-2019 school year. The agreement and the NOREP appear to be purposefully designed to establish pendency at The Concept School. However, I do not have authority to determine if the agreement between the Parents and PALCS is fraudulent.

Case law establishes my authority to determine if parties to a due process hearing are bound by a contract. *I.K. v. School District of Haverford*, 2011 U.S. Dist. LEXIS 28866 (E.D. Pa. Mar. 21, 2011). In making that determination, courts have signaled that I may consider fraud. *A.S. v. Office for Dispute Resolution (Quakertown Community School District)*, 88 A.3d 256, 263 (Pa. Commw. 2014). This case is distinguishable because the District is not asking me to evaluate a contract between the parties to this due process hearing. Rather, the District is asking me to evaluate a contract between a party to this hearing and a third party. Nothing in the IDEA or its federal or state implementing regulations gives me the power to evaluate contracts. My authority in this regard is entirely a construct of case law. I decline to extend my authority beyond what current case law explicitly permits.

The parties should note that the question of fraud goes to the contract's enforceability and potential civil claims beyond the IDEA. Those issues are outside my jurisdiction. However, the Parents demand tuition reimbursement and in developing my final decision on the merits of the parties' due process positions I will consider equitable factors as part of any tuition reimbursement analysis. *Burlington School Committee v. Department of Education*, 471 U.S. 359, 374 (1985); *Florence County Sch. Dist. Four V. Carter*, 114 S. Ct. 361 (1993). Nothing herein precludes evidence of or arguments about the equities in this case.

Despite the foregoing, judges tell hearing officers that they have more authority than the IDEA itself suggests with some frequency. Since pendency determinations can have long-lasting consequences, I will evaluate whether fraud would alter the outcome of this pendency determination.

The outcome of this pendency determination does not change even if I can determine that the agreement between the Parents and PACLS is fraudulent. Assuming that I can make such a determination, and further assuming that the agreement is fraudulent, yields the same result. As with the intrastate transfer rule, the mechanism by which the Student arrived in the Student's current placement is not relevant to a pendency analysis.

Nothing in the pendency rule permits me to consider how the Student arrived at The Concept School. Instead, my task is to determine what the Student's placement was at the time of filing. Above, I determine that The Concept School is the Student's last-approved and operative placement when this hearing was requested. Consequently, The Concept School is the Student's pendent placement.

Finally, I urge both parties to proceed with the utmost caution and with serious thought about how actions taken within this hearing could impact upon other potential claims. The language in the Parents' pendency motion and the District's response signal claims that both parties have

against each other outside of this hearing. Be that as it may, I confine myself to the issue before me and resolve the instant pendency dispute in the Parents' favor.

## ORDER

And now, September 5, 2019, it is hereby **ORDERED** that the Parents' Motion for Pendency is **GRANTED.** The Concept School is Student's placement during the pendency of this special education due process hearing.

September 5, 2019

Linda M. Valentini, Psy.D, CHO

Special Education Hearing Officer

NAHO Certified Hearing Official

# EXHIBIT B

*This is a redacted version of the original decision. Select details have been removed from the decision to preserve anonymity of the student. The redactions do not affect the substance of the document.*

# Pennsylvania Special Education Hearing Officer

### Final Decision and Order

**CLOSED HEARING**

**ODR File Number:** 22560/19-20 AS

**Date of Hearing**

September 26, 2019

**Child's Name:** S.O.     **Date of Birth:** [redacted]

**Parents:**

[redacted]

*Counsel for Parents:*

Katie Metcalfe

Kershenbaum and Raffaele

1230 County Line Road

Bryn Mawr, PA 19010

**Local Education Agency:**

West Chester Area School District

782 Springdale Drive

Exton, PA 19341

*Counsel for the LEA*

Jason Fortenberry, Esquire

Sweet, Stevens, Katz, & Williams

331 East Butler Ave.

New Britain, PA 18901

**Hearing Officer:**   Linda M. Valentini, Psy.D, CHO

Certified Hearing Official

**Date of Decision: October 27, 2019**

## Background

Student[1] is a mid-teen aged District resident with multiple disabilities who is identified as eligible for special education under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* and its Pennsylvania implementing regulations, 22 Pa. Code § 14 *et seq.* (Chapter 14). As such, Student is also regarded as an "individual with a disability" as defined by Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 701 *et seq.*, and as a "protected handicapped student" under the Pennsylvania regulations implementing Section 504 in schools, 22 Pa. Code § 15 *et seq.* (Chapter 15).

Student currently attends a small private school for students with disabilities, which is Student's pendent placement pursuant to a September 5, 2019 ruling by this hearing officer. Student attended District schools from Kindergarten through 5th grade, and then was enrolled in a Pennsylvania cyber charter school which was Student's LEA through the 2018-2019 school year.

The Parents requested this hearing because they believe that the program and placement the District offered to their child is inappropriate. The District maintains that Student's reenrollment in June 2019 for the 2019-2020 school year was an intrastate transfer, and therefore the IEP and NOREP offered were adequate under the requirements for intrastate transfers. The District also argues that when the Parents reenrolled Student into the District they did not request that the District provide an offer of FAPE.

In reaching my decision I carefully considered the witnesses' sworn testimony, documents admitted into the record, and the parties' written closing legal arguments. Below I reference the evidence that I found to be directly relevant to deciding the issues before me; hence not all testimony nor all documents comprising the record are cited. Based on the record before me I find in favor of the Parents.

### Issues

1. Did the District deny Student a free, appropriate public education (FAPE) for the 2019-2020 school year?

2. If the District denied Student FAPE, is the private school an appropriate placement for Student?

3. If the District denied Student FAPE, and the private school is appropriate, are there equitable considerations that would reduce or remove the District's obligation to reimburse the Parents for Student's tuition?

---

[1] In the interest of confidentiality and privacy Student's name and gender, and other potentially identifiable information, are not used in the body of this decision. The identifying information appearing on the cover page or elsewhere in this decision will be redacted prior to posting on the website of the Office for Dispute Resolution as part of its obligation to make special education hearing officer decisions available to the public pursuant to 20 U.S.C. § 1415(h)(4)(A) and 34 C.F.R. § 300.513(d)(2).

## Findings of Fact[2]

Background Information[3]

1. Student is currently classified under the IDEA as having a Specific Learning Disability (reading, math and writing), Other Health Impairment (ADHD), and Emotional Disturbance (mood disorder, anxiety). Student has also been diagnosed with an Auditory Processing Disorder/Sensory Processing Disorder (misophonia)[4] and has some characteristics of autism spectrum disorder. [NT 257; J-13, J-19, J-25, J-26][5]

2. Student currently is prescribed psychotropic medications to address Student's mood, anxiety, and ADHD symptoms. [NT 257-258; J-19, J-25]

3. Student easily becomes overwhelmed by a large number of people in a room and certain noises. When Student is overwhelmed, Student either gets agitated and angry at the person making the noises or shuts down. [NT 134, 137; J-19, J-26]

4. At home Student stays in Student's room a good deal of the time because of not being able to tolerate the sounds in the shared areas of the home. [NT 287]

5. Student experiences social anxiety, and experiences up and down mood changes. The anxiety can be triggered by sensory overload and by social situations. [NT 138-139, 288; J-19]

6. From 3rd through 5th grade Student suffered from severe anxiety and depression. [NT 258]

---

[2] Transcript page references to witnesses are as follows: Emotional Support Teacher/Case Manager NT 28 through 99; District School Psychologist NT 101 through 128; Student's Private Therapist NT 131 through 153; Special Education Supervisor NT 155 through 218; Head of Private School NT 219 through 256; Student's Mother NT 257 through 320.

[3] To the extent that the District may claim that it did not know some of the background information in this section, I have no doubt that if the District had 1) read its own past evaluation, the cyber charter school's reevaluation, and the recent thorough private neuropsychological/psychoeducational evaluation, and 2) spoken with the private school staff and with Student's therapist, and 3) conducted a competent interview with the Parents, it would have had knowledge of the entirety of this information. Although a program can only be judged on what an LEA knew at the time it created a program and placement, there is no defense in a District's not having accessed information that was readily available.

[4] Misophonia refers to "an extreme sensitivity to specific sounds produced by human beings, resulting in excessive, unreasonable, or out of proportion anger, disgust, or distress. Possible triggers include eating sounds (smacking, swallowing, apple eating), breathing sounds, finger/hand sounds (typing, pen clicking, nail clipping), foot sounds (footsteps, sound of high heels), and repetitive visual movements (leg rocking)". Johns Hopkins Psychiatry Guide, January 29, 2017.

[5] The Parties' presenting a set of Joint exhibits in this matter is noted with appreciation.

7.  In 4th grade Student engaged in suicidal behavior by attempting to choke self and was placed in a psychiatric hospital. [NT 259; J-19]

8.  In mid-5th grade Student was given a 504 Plan. [NT 259]

9.  After having been diagnosed with a Psychotic Disorder and Generalized Anxiety Disorder Student was evaluated by the District and in June of 5th grade Student was found eligible for special education under the classifications of Emotional Disturbance and Other Health Impairment.  [J-12]

10. For 6th grade (2015-2016 school year) the Parents enrolled Student into a cyber charter school because Student was "unraveling" and they  believed that Student needed to be educated in a fashion where Student could be at home in a controlled environment.  [NT 260-261]

11. The cyber charter school reevaluated Student in November 2016, Student's 7th grade year, finding a primary disability category of Autism and secondary disability categories of Specific Learning Disability and Other Health Impairment. [J-13, 15]

12. The cyber charter school provided an IEP on November 21, 2016 with a revision on February 8, 2017.  [J-14]

13. During 7th grade Student told the mother that Student wanted to commit suicide and didn't feel safe. Student was admitted into a psychiatric hospital for a week and then began receiving outpatient psychotherapy with the current therapist who was the eighth or ninth therapist Student had seen.  [NT 264]

14. In 7th grade the cyber charter school provided an individual tutor in the home for a few hours a day to help Student get through a few assignments.  [NT 267]

15. The Parents began looking for a new school, and after having been rejected by several other schools because of the psychiatric history, Student was accepted into the current private school for 8th grade.  The cyber charter school remained Student's LEA. [NT 268]

16. Student attended the private school for the 2017-2018 and the 2018-2019 school years, Student's 8th and 9th grades.  On August 13, 2018 pursuant to a settlement agreement the Charter School issued a NOREP for Student's 2018-2019 placement at the private school and on September 5, 2018 issued an IEP for implementation at the private school. Student remained enrolled in the cyber charter school through the conclusion of its 2018-2019 school year, during which time the cyber charter school was the LEA and issued Student's IEPs and NOREPs. [J-21]

Enrollment into the District

17. On April 27, 2019 the Parents enrolled Student into the District for the 2019-2020 school year, Student's 10th grade year, using the District's online portal, and listed the private

school as Student's current school. [J-6, J-43]

18. The Parents believed that they would be contacted by the District. Having heard nothing from the District after nearly a month, the Mother called the counseling office in late May and learned that due to a District computer system upgrade the Parents had to redo the enrollment process; the Parents completed another enrollment form for the 2019-2020 school year on June 2, 2019.  [NT 157; J-7]

19. The District's school year ended on June 13, 2019.  [NT 110]

20. If a student is eligible for special education, the District's counseling office contacts the supervisor of special education or the special education liaison to communicate this information.  [NT 156-157]

21. The counseling office informed the Parents that the earliest date for a registration meeting appointment was July 17, 2019. [NT 273-274, 303-304]

22. The Parents were disappointed that the meeting was so far out because they knew Student had an IEP and they had to "talk about a bunch of things" with the District. [NT 274]

23. Between June 2, 2019 and July 17, 2019, neither the supervisor of special education, the special education liaison, nor anyone else in the District contacted the Parents.  [NT 160, 273]

24. Prior to the registration appointment, the District did not issue an invitation for an IEP meeting or a permission to reevaluate form (PTRE).  [NT 161]

The Registration Meeting

25. According to the supervisor of special education, "The biggest concern in a registration meeting is to make sure we know how many credits a student has.  It's not an IEP meeting.  It's really more of a credit check to see how we can create a schedule." [NT 163]

26. Student's Parents, the supervisor of special education and a high school counselor attended the registration meeting.  [NT 162]

27. The Parents brought a spring 2019 private Neuropsychological/Psychoeducational Evaluation and the 2016 IEP[6] from the cyber charter school to the registration meeting and gave them to the supervisor of special education.  They also gave the District a signed consent to contact the private school.  The District did not offer the Parents a consent form to contact the private evaluator.  [NT 163; 275, 277]

---

[6] At the time the Parents were not aware that there was a 2018 IEP as well. [NT 275-276]

28. At the registration meeting, the supervisor of special education told the Parents that the District was going to implement the cyber charter school IEP and that the District would plan to have an IEP meeting before the end of September.  [NT 170, 277-278]

29. Given Student's emotional fragility the Parents were alarmed about the District's plan to place Student in the large setting of the District's high school without a new IEP, and on July 18, 2019 they sent a letter asking that the District fund Student's placement at the private school for the 2019-2020 school year.  [NT 282-283; J-21]

30. On July 22, 2019 the supervisor of special education sent the Parents a reply stating, "As we discussed at the registration, the district is in the process of scheduling [Student] for the classes [Student] will need at [the high school], based on the previous IEP from [the cyber charter school]…The [new] IEP is due very soon and the team will need to meet to have the annual meeting as well as discuss the re-evaluation process.  The re-evaluation is due by November."  Further, "We will be issuing a Notice of Recommended Educational Placement ('NOREP') describing the schedule as well as the frequencies of interventions."  The next day the supervisor of special education sent the Parents Student's proposed class schedule.  [NT 171; J-21, J-22]

31. In the same email advising the Parents that the District would implement the IEP from the cyber charter school, the supervisor of special education wrote the Parents that if they "would like to attend an IEP meeting to discuss the pendent IEP and programming prior to the school year beginning, [to] please let [him] know [their] availability during the week of August 19th. … At this meeting we will be discussing the reevaluation process, including the types of assessments necessary for programming for [Student]."  The meeting was scheduled for August 23, 2019. Teachers and students were back for the 2019-2020 school year as of the date of the August 23, IEP meeting[7]. [NT 104; J-23]

32. On July 31, 2019 the supervisor of special education issued a NOREP he had written in the absence of an IEP team meeting, denying Parents' request for payment for the private school. Even though Student was not transferring into the District in the middle of a school year, for some very unclear reason the District was considering Student to be an intrastate transfer student, and issued a NOREP for implementation of the existing 2016 cyber charter school IEP at a District high school.  The NOREP states that the action proposed is that the charter school IEP would be honored until a new District IEP is written and conferenced by September 30, 2019. The Parents did not approve the NOREP and filed their due process request on August 9, 2019.  [NT 175-176; J-23; J-8]

Creation of the District's Proposed IEP

33. The private Neuropsychological/Psychoeducational Evaluation in the District's possession as of July 17, 2019 is a 21-page, single spaced report in very small font that presents an extraordinarily thorough picture of Student. It contains relevant educational, medical, psychiatric, familial and social background history; a detailed review of

---

[7] There is a discrepancy in the record. In another place the first day for students in the high school was noted to be Monday August 26th. [NT 17] This is a distinction without a material difference.

previous testing including a 2015 Auditory Sensitivity Evaluation, a June 2015 District psychoeducational evaluation with numerical scores, a November 2016 cyber charter school psychoeducational reevaluation with numerical scores; a Winter 2016-2017 Auditory Processing Evaluation, and a January 2017 Speech/Language Evaluation with numerical scores. [J-19]

34. The private Neuropsychological/Psychoeducational Evaluation in the District's possession as of July 17, 2019 included the examiner's direct one-and-a-quarter hour 5-minute interval observation of Student at the private school in math and English class and behavioral observations of Student during testing. [J-19]

35. The private Neuropsychological/Psychoeducational Evaluation in the District's possession as of July 17, 2019 included cognitive assessment with the Wechsler Intelligence Scale for Children – 5th Edition; memory assessment with the Test of Memory and Learning – 2nd Edition; attention and focus assessment with the Conners Continuous Performance Test-II Version 5; executive functioning assessment with the Delis-Kaplan Executive Function System; visual motor assessment with the Grooved Pegboard and the Beery-Buktenica Developmental Test of Visual-Motor Integration – 6th Edition. [J-19]

36. The private Neuropsychological/Psychoeducational Evaluation in the District's possession as of July 17, 2019 included current academic achievement assessment with the Woodcock-Johnson Tests of Achievement – 4th Edition using age-based norms; the Test of Written Language – 4th Edition; the Gray Oral Reading Test – 5th Edition; the Comprehensive Test of Phonological Processing-2; and the Clinical Evaluation of Language Fundamentals-5. [J-19]

37. The private Neuropsychological/Psychoeducational Evaluation in the District's possession as of July 17, 2019 included assessment of behavioral/emotional/social functioning with the Behavioral Assessment System for Children Parent-Report, Teacher-Report, and Self-Report and the Autism Spectrum Rating Scales-Parent Report and Teacher Report.. [J-19]

38. The private Neuropsychological/Psychoeducational Evaluation in the District's possession as of July 17, 2019 included recommendations for school programming as well as other interventions. [J-19]

39. On or about August 8, 2019 the District's assigned case manager, an emotional support teacher, was assigned to draft Student's IEP. The case manager was told that a new 10th grade student was enrolling, and that the enrollment was an intrastate transfer. She had only the 2016 7th grade IEP from the cyber charter school and was told "to basically transcribe over based on that [cyber charter school] IEP into a [District] format to provide comparable services until an evaluation would be completed". She completed the draft for Student's 10th grade year based on the 2016 cyber charter school's 7th grade IEP sometime between August 12th and August 23, 2019. [NT 29, 31-34, 36-38, 67, 105, 178; J-13]

40. Although the supervisor of special education gave the case manager the IEP the Parents had given him on July 17, 2019, he did not give her a copy of the private Neuropsychological/Psychoeducational Evaluation the Parents had also given to him on that date until the day of the August 23, 2019 IEP meeting. [NT 34-35; J-19]

41. The supervisor of special education advised the case manager that any outside evaluations would be reviewed further by someone "more qualified". However, a District psychologist did not review the cyber charter school's RR or the recent private Neuropsychological/Psychoeducational Evaluation for purposes of crafting the IEP. [NT 67]

42. The case manager used the IEP Writer program to draft the IEP. For reasons that are unclear, she did not have access to the District's own previous evaluation or IEP. [NT 34; J-12, J-13]

43. The case manager knew that Student attended the private school for the 2018-2019 school year and not the cyber charter school. [NT 99]

44. Prior to drafting the IEP the case manager did not ask the Parents to bring Student in for baseline testing to determine current present levels of educational performance. The case manager did not contact the Parents to solicit information about Student, she did not review records from the private school, and did not attempt to do any transition assessments. The director of special education did not ask anyone else to bring Student in for assessments of present academic levels. [NT 35, 182]

45. The case manager did not send a copy of the draft IEP to the Parents for their review prior to the. August 23, 2019 IEP meeting. [NT 39]

The Draft Proposed August 23, 2019 IEP and the Final Proposed IEP:[8]

46. Rather than holding an IEP meeting over the summer, the District scheduled an IEP meeting for Friday August 23, 2019, not sending out the Invitation to the meeting until August 14, 2019 offering a date the week of August 19th.[9] [NT 178; J-9]

47. At the IEP meeting the Parents gave the District a letter from Student's psychiatrist and a letter from Student's therapist. The District did not ask the Parents to sign any consent forms allowing verbal or written contact with either mental health professional. [NT 93; J-25]

48. Given Student's extreme sound sensitivity, the Parents expressed concerns at the IEP meeting about class size and the noise in hallways during change of classes, and also

---

[8] The proposed draft IEP is J-28 and the proposed final draft IEP is J-10. There were minimal changes from one to the other. Both were prepared after the Parents filed for due process.
[9] This date was either just after or just before the District's students started back to high school.

shared information about Student's difficulties in crowded areas and being in large groups, and also about Student's anxiety and depression. [NT 40, 64]

49. The District proposed two IEPs – one at the August 23rd IEP meeting and another in September. The draft proposed IEP was based solely on the 2016 cyber charter school's IEP. After the August 23, 2019 IEP meeting the case manager gained access to the 2018 cyber charter school's IEP. She then compared the 2018 IEP with the 2016 IEP and transcribed the differences/changes into the final IEP. [NT 54-55]

50. When she transcribed them into the District's IEP, the case manager did not realize that the goals on the cyber charter school's 2018 IEP were exactly the same as those on the cyber charter school's 2016, 7th grade, IEP. [NT 46]

51. The proposed IEP recorded the same Present Levels of Functional Performance as were on the cyber Charter School's 2016 IEP. The case manager did not know how Student was doing currently; she just transcribed the information from the three-year-old 2016 IEP. [NT 44]

52. The effect of Student's disability on involvement in general education was taken from the 2016 IEP. [NT 44]

53. The statement of Student's strengths and needs was taken from the 2016 IEP. [NT 44]

54. Although it was not necessary for the District to itself complete an entire reevaluation in order to place current information into the IEP, information about Student's current functioning contained in the private Neuropsychological/Psychoeducational Evaluation that was in the District's possession since July 17, 2019 was not included in the proposed IEP. [NT 45, 62, 91]

55. The proposed IEP provided for special education 10th grade classes for English, Math, Reading and Study Skills. Student's other major subject classes (science and social studies) would be in the general education 10th grade classes that hold about 25 to 30 students. [NT 42-44, 295]

56. The proposed IEP provided for a special education emotional support class, "Strategies". The Strategies class was scheduled for two periods in a five-day cycle, but Student would have access to the emotional support classroom as needed, not for direct instruction but just for a break. [NT 43; J-10]

57. The two periods a cycle Strategies class was intended to help Student cope with anxieties and sadness, understand Student's learning differences, encourage motivation to engage in academic activities, and find areas of competence to improve Student's attitude about school as well as to assist in developing age appropriate social skills including pro social skills, conflict resolution strategies, and self-advocacy skills. [J-10]

58. The goals on the cyber charter school's 2016 IEP (7th grade) and 2018 IEP (9th grade) were identical. Transcribed directly, the District offered five academic goals in the IEP it offered to Student: a math goal for improving performance in math applications; a math goal for improving performance in math fact fluency; a reading goal for improving reading comprehension; a reading goal for improving reading fluency; a writing goal for improving the total words written by Student.  [NT 46-48; J-10]

59. The baselines connected to the goals written into the District's IEP for 10th grade are exactly the same as those in the 2016 7th grade IEP with 7th grade information.  [NT 48; J-10; J-14]

60. Compared with the cyber charter school's IEP, the District offered direct instruction with more frequency and longer duration in the areas of reading, math, and writing. [J-5, J-10]

61. The District offered direct instruction in time management, planning and organization skills three times per week in 45-minute periods.  [J-10]

62. The final IEP provides for occupational therapy (OT) services but there is no IEP goal for this related service. [NT 53; J-10]

63. Counseling services were included in the draft proposed IEP but were dropped from the final IEP.  The case manager who wrote the IEPs does not remember why counseling as a related service was dropped. [NT 53; J-10, J-28]

64. Student was deemed eligible for extended school year (ESY) services in the draft proposed IEP but ESY eligibility was denied in the final IEP. The case manager did not consult with or inform the Parents that ESY was being removed from the final IEP.  [NT 55]

65. Although with regard to placement the cyber charter school's 2018 IEP is inconsistent with its 2018 NOREP the supervisor of special education did not contact the cyber charter school to ask for an explanation and "just consulted the IEP" to figure out the inconsistency.  [NT 208; J-5, J-18]

66. The District offered Student supplemental learning support and autistic support but as of the time of the issuance of the District's IEP it was not determined whether Student would be placed in an emotional support homeroom.  [NT 57; J-30]

67. Although the District maintained that it was offering Student "comparable services" it did not consider full time special education as its offered placement even though that was the last placement offered by the cyber charter school and carried out at private school.  [NT 58; J-30]

68. The District did not issue a Permission to Reevaluate form (PTRE) to the Parents until August 29, 2019. The Parents consented, signed, and returned the PTRE on September 4, 2019. To date an evaluation has not begun.  [NT 167; J-29]

The Private School

69. As per this hearing officer's ruling, the private school is Student's pendent placement. The Parents have not signed the contract for this school year. [NT 229]

70. The private school is licensed by the Pennsylvania Department of Education. The curriculum of the upper school is based on state standards. [NT 221-222]

71. The private school's goal is to provide a nurturing supportive individualized environment. [NT 221]

72. The class size at the private school is three students to one teacher, and a student may take breaks as needed. In the very small classroom environment Student self-advocates, asks questions, and contributes to discussions. [NT 221, 224]

73. Student still needs to go to the library for a break three to four times a day because of extreme sensitivity to noise. [NT 224]

74. Student needs to eat alone or with a friend rather than in the small kitchen where fewer than fifteen students eat lunch. [NT 225].

75. Student has daily periods of anxiety. The teachers at the private school are able to recognize students who are having an anxiety period and take them out to review coping skills or recommend they take a break. [NT 228-229]

76. The private school provides Student with one to one coaching and support, quiet space, and hands-on activities. [NT 234-235]

77. Student has been doing well academically at the private school and has gained in confidence, with a relative lifting of mood and attitude toward school. [NT 232, 270-271, 288-289; J-33; J-34]

**Legal Basis**

Burden of Proof: The burden of proof, generally, consists of two elements: the burden of production [which party presents its evidence first] and the burden of persuasion [which party's evidence outweighs the other party's evidence in the judgment of the fact finder, in this case the hearing officer]. In special education due process hearings, the burden of persuasion lies with the party asking for the hearing. If the parties provide evidence that is equally balanced, or in "equipoise", then the party asking for the hearing cannot prevail, having failed to present weightier evidence than the other party. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 392 (3d Cir. 2006); *Ridley S.D. v. M.R.*, 680 F.3d 260 (3rd Cir. 2012). In this case the Parents asked for the hearing and thus assumed the burden of proof.

Credibility: During a due process hearing the hearing officer is charged with the responsibility of

judging the credibility of witnesses, weighing evidence and, accordingly, rendering a decision incorporating findings of fact, discussion and conclusions of law.  Hearing officers have the plenary responsibility to make "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses *Blount v. Lancaster-Lebanon Intermediate Unit,* 2003 LEXIS 21639 at \*28 (2003); The District Court "must accept the state agency's credibility determinations unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion." *D.K. v. Abington School District*, 696 F.3d 233, 243 (3d Cir. 2014);.*see also* generally *David G. v. Council Rock School District*, 2009 WL 3064732 (E.D. Pa. 2009); *T.E. v. Cumberland Valley School District*, 2014 U.S. Dist. LEXIS 1471 \*11-12 (M.D. Pa. 2014); *A.S. v. Office for Dispute Resolution (Quakertown Community School District*, 88 A.3d 256, 266 (Pa. Commw. 2014); *Rylan M. v Dover Area Sch. Dist.*, No. 1:16-CV-1260, 2017 U.S. Dist. LEXIS 70265 (M.D. Pa. May 9, 2017).  I found Student's mother to be very credible, as her memory for details was evident and because she was willing to provide candid responses about difficult but pertinent personal and family information.  In contrast I found the testimony of the District psychologist to be a tortuous but unconvincing attempt to persuade this hearing officer that completing an evaluation or at least obtaining present academic levels of Student over the nearly three-month period between when the District became the LEA and the creation of the IEP was impossible. I found the case manager to be credible as she described the directives she had been given regarding transcribing the 2016 cyber charter school's IEP onto the 2019 District IEP to be implemented in the "bricks-and-mortar" high school setting.

FAPE: Student is entitled by federal law, the Individuals with Disabilities Education Act 20 U.S.C. Section 600 *et seq.* and Pennsylvania Special Education Regulations at 22 PA Code § 14 *et seq.* to receive a free appropriate public education (FAPE).  FAPE "consists of educational instruction specifically designed to meet the unique needs of the handicapped child supported by such services as are necessary to permit the child to benefit from the instruction." *Ridley School District v. M.R.*, 680 F.3d at 268-269, citing *Board of Education v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034 (1982). The IDEA contemplates educational programs tailored to "how the child's disability affects the child's involvement and progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa). In *Endrew F. v. Douglas Cnty. Sch. Dist.* RE-1, 137 S. Ct. 988 (2017), the U.S. Supreme Court concluded that "the IDEA demands ... an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

Intrastate Transfers: A school district's programming and placement obligations to a student within the IDEA's intrastate transfer provision at 20 U.S.C. §1414(d)(2)(C)(i)(1) is as follows:

> "In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law." [20 U.S.C. §1414(d)(2)(C)(i)(1); see also 34 C.F.R. § 300.323(e); 22 Pa. Code §14.102(a)(2)(xxvii) (requiring compliance with 34 C.F.R. § 300.323).]

12

"Comparable services" is not defined in the IDEA or federal regulations.  But in comments accompanying the 2006 regulations, the Office of Special Education and Rehabilitative Services, U.S. Department of Education ("OSERS") responded:

> We do not believe it is necessary to define "comparable services" in these regulations because the Department interprets "comparable" to have the plain meaning of the word, which is "similar" or "equivalent."  Therefore, when used with respect to a child who transfers to a new public agency from a previous public agency in the same State …, "comparable" services means services that are "similar" or "equivalent" to those that were described in the child's IEP from the previous public agency, as determined by the child's newly designated IEP Team in the new public agency. Fed. Reg. Vol. 71, No. 156 at 46681 (Aug. 14, 2006) (emphasis added).

Evaluations: Under the Pennsylvania evaluation timeline, an evaluation "shall be completed and a copy of the evaluation report presented to the parents no later than 60-calendar days after the agency receives written parental consent for evaluation, except that the calendar days from the day after the last day of the spring school term up to and including the day before the first day of the subsequent fall school term will not be counted." 22 Pa. Code § 14.123(b). The IDEA requires consideration of privately obtained evaluations, although not adoption of any conclusions or recommendations set forth therein.  20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(c).

Tuition Reimbursement: Parents who believe that a district's proposed program or placement is inappropriate may unilaterally choose to place their child in what they believe is an appropriate placement, but they place themselves at financial risk if the due process procedures result in a determination that the school district offered FAPE, otherwise acted appropriately, or that the parents' selected placement is inappropriate.

In *Burlington School Committee v. Department of Education*, 471 U.S. 359, 374 (1985) the United States Supreme Court established the right to consideration of tuition reimbursement for students placed unilaterally by their parents. *Florence County Sch. Dist. Four V. Carter*, 114 S. Ct. 361 (1993) later outlined the Supreme Court's test for determining whether parents may receive reimbursement when they place their child in a private special education school.  The criteria are: 1) whether the district's proposed program was appropriate; 2) if not, whether the parents' unilateral placement was appropriate, and; 3) if so, whether the equities reduce or remove the requested reimbursement. This three-part test is referenced as the "Burlington-Carter" test for tuition reimbursement claims under the IDEA. The second and third tests need be applied only if the first is resolved against the school district.

Section 504/Chapter 15 – Denial of FAPE:
Section 504 and Chapter 15 also require that children with disabilities be provided with FAPE. (34 C.F.R. §104.33; 22 PA Code §15.1). The provisions of IDEA/Chapter 14 and related case law, in regard to providing FAPE, are more voluminous than those under Section 504 and

Chapter 15, but the standards to judge the provision of FAPE are broadly analogous; in fact, the standards may even, in most cases, be considered to be identical for claims of denial of FAPE. (*See generally P.P. v. West Chester Area School District*, 585 F.3d 727 (3d Cir. 2009)). Therefore, the foregoing analysis under the IDEA is adopted here for purposes of considering the claim under Section 504/Chapter 15.

**Discussion**

Hindsight, of which I have the privilege, reveals the various stages at which the District could have acted in such a way as to create an appropriate program and placement for this child. Unfortunately, although this certainly could not have been its intent, the District presents itself in this matter as being, at best, *laissez-faire* about its obligations to Student. I have to concur with the Parents' attorney who expressed wonderment in her opening statement as to why we were having the hearing in the first place, as there are several things about the District's handling of its obligations to this child that are puzzling.

First of all, especially since the District's computer system error resulted in a registration date of June 2, 2019, why did the District consider Student to be an intrastate transfer student when it was clear that enrollment was for the 2019-2020 school year? Second, having learned that this was a child who was eligible for special education and who was attending a specialized emotional support private school, why did the District let the entire summer pass before obtaining academic baselines, if not doing an evaluation based largely upon the recent and thorough private Neuropsychological/Psychoeducational Evaluation the Parents gave the District? Third, after making the choice to consider this an intrastate transfer, and to transcribe the existing IEP, why didn't the District realize that the IEP on which it was basing 'comparable services' was written in 2016, from early 7th grade, when Student was enrolling as a 10th grader? Fourth, after receiving the recent private Neuropsychological/ Psychoeducational Evaluation from the Parents at the July 17th registration meeting, and not using it as a basis to craft a reevaluation report, why didn't the District at least have one of the District psychologists review it in order to inform the IEP that was being prepared for the August 23, 2019 meeting? Fifth, after learning firsthand from the Parents about Student's emotional and extreme sensory challenges, why didn't the District reconsider its placement options and provide a significantly more robust emotional support program, with truly "comparable" services, even if it were still going to be offered within the District? These concerns are more fully addressed below.

The intrastate transfer provision of the IDEA makes perfect common sense, as well as legal sense: when an eligible child for whatever reason has to change LEAs, it is appropriate for the receiving LEA to provide a comparable program and placement so that the child's special education services are not disrupted during the course of a single school year. However, I can adduce no logical reason for the District to consider Student an intrastate transfer student given that the Parents were not moving Student into the District in the middle of an ongoing school year, but instead, days before the end of the 2018-2019 school year, enrolled Student for the following school year.

That having been said, neither the IDEA nor its implementing regulations address a school district's obligation to provide services to a student who transfers at the very end of a school year

or over the summer. Instead, the plain language of the intrastate transfer rule specifies that the rule applies only "when a child transfers within the same academic year." (emphasis added) As such, as I noted in my Pendency Ruling, I find that the intrastate transfer rule does not apply to this case. I hold that the IDEA's intrastate transfer provision does not apply to transfers that occur while school is not in session or when there are merely days left, particularly when the enrollment is for the next school year not the current school year.[10]

The District argues that since a student cannot be enrolled in two LEAs at once, Student could not be "enrolled" in the West Chester Area School District any earlier than the day following the last day of the 2018-2019 school year at the cyber charter school since the cyber charter school provided for all of Student's education and served as Student's LEA through the conclusion of Student's 9th grade, the 2018-2019 school year. I have no quarrel with this assertion, and find that it in fact supports the position that Student was not an intrastate transfer student. Although the last date of the cyber charter's school year in 2018-2019 is not available in the record or online, I note that the last day for the cyber charter school's 2019-2020 school year is Thursday June 4, 2020.[11] Extrapolating from this information, with 2020 being a leap year, I calculate that the end of the cyber charter school's 2018-2019 school year was likely to have been either Wednesday June 5th or Thursday June 6th. Since the Parents had to redo the enrollment procedure on June 2, 2019 (giving the District the one-day benefit of the doubt) the District became Student's LEA as of Friday June 7th. The District therefore had nearly three months to work with the Parents to craft an appropriate IEP for this child.

Seemingly abandoning its position that the District was not Student's LEA until the end of the cyber charter school's academic year, the District argues that assuming an enrollment as early as April 27, 2019, there was not enough time for the District to complete an evaluation of Student prior to the start of the 2019-2020 school year. In defending itself for not attempting to reevaluate Student over the summer (which would have been in its own best interests), in addition to unconvincingly claiming that there was no available psychologist's time over the summer, the District argues that finishing the evaluation would not have been possible before the start of school given the 60-day completion requirement. The District conflates black letter obligation (the 60th day is the deadline for producing an evaluation) with prohibition. There is absolutely nothing in the law that says that a District cannot conduct an evaluation and produce a report before the 60-day deadline. For various reasons school districts may and do conduct expedited evaluations. Moreover, without completing an entire evaluation, with parental consent the District could have at least obtained updated present levels of academic performance and/or based a District reevaluation on the recent very thorough private Neuropsychological/Psychoeducational Evaluation the Parents had provided to the supervisor of special education over one month before the IEP meeting. Even if this child were an intrastate transfer Student, and I reject the proposition that this is the case, knowingly creating an IEP based on 3-year-old data for a seriously impaired child is beyond any possible justification.

---

[10] My determination may be a matter of first impression, as my research revealed no other cases directly on point. I recognize, however, that reasonable minds could differ. It is possible but counterintuitive to conclude that an academic year does not end until the next academic year starts.

[11] http://s3.amazonaws.com/achievementcharter.com/uploads/2019-20-School-Calendar-List-View.pdf?mtime=20190701123415. Visited on October 26, 2019.

The District's position articulated by the supervisor of special education and the school psychologist that it lacked the time and the personnel to conduct an evaluation is severely undercut by the fact that from July 17, 2019 on it had the recent, exceptionally thorough private Neuropsychological/Psychoeducational Evaluation in its possession.  That evaluation satisfied every IDEA criterion for an appropriate evaluation.  Rather than transcribing the 2016 cyber charter school's IEP into District IEP format, the District would have better served its purposes and Student's needs by extensively using the private evaluation as the basis for writing a District evaluation upon which a reasonable IEP could have been based. Putting the District's imprimatur on at least the academic and behavioral findings of the private evaluation, the District may have gone a long way in being able to offer a program and placement that this hearing officer could seriously consider.

The District maintains that because the Parents did not request an offer of FAPE to determine what the District could offer the Student prior to registration, the District was only obligated to consider the Student an intrastate transfer student and provide "comparable services". I admit that I fail to grasp the District's point here. As of the end of the 2018-2019 school year the Parents were enrolling their child into the District for the 2019-2020 school year. Student had been eligible for special education at the time the Parents disenrolled Student from the District and Student continued to be eligible for special education when the Parents reenrolled Student in the District.  The Parents did not know they had to say magic words indicating they wanted FAPE for their child [NT 300-302] when the District certainly knew that the child was entitled to FAPE. I hold that given the District's knowledge that Student was eligible for special education the District incurred the obligation to make a genuine offer FAPE with or without the magic words having been said.

The Parents rightly dispute the appropriateness of the District's offered services regardless of whether those services were developed through the regular IEP process or through the intrastate transfer process. The final IEP the District proposed was in great part transcribed from an IEP that was three years old and to be implemented at home through a cyber program and another IEP that was one year old and to be implemented in a small private emotional support school. The present levels in the 10th grade IEP were three years old, with data taken from Student as a 7th grader, the goals were three years old based, on Student's 7th grade needs, and there was no behavioral data to support programming for Student's emotional support.  Even as an intrastate IEP the District's offer was so inadequate as to be indefensible, and judged from a robust FAPE standard the District's proposed program and placement is even less adequate and is wholly inappropriate. Sadly, this conclusion must be reached even though the District had the wholly appropriate and extremely thorough private Neuropsychological/Psychoeducational Evaluation in its possession given freely by the Parents for its consideration in programming for this child.

However, even if for purposes of argument, the intrastate transfer rule did apply in this case, and I hold that it does not, under the intrastate transfer rule the District failed to meet even the few basic requirements under the rule. The intrastate transfer rule says that an LEA must provide services "*in consultation with the Parents*" until it can develop its own IEP.  In this case, the Parents were offered no meaningful opportunity for their input to be considered in any way that could remotely be viewed as fair. Further, the Department of Education interprets "*comparable*" to have the plain meaning of the word, which is "*similar*" or "*equivalent*" and thus "*comparable*" services means services that are "similar" or "equivalent" to those that were described in the

child's IEP from the previous public agency, as determined by the child's newly designated IEP Team in the new public agency.  In neither the program nor the placement did the District offer services "*similar*" or "*equivalent*" to those provided in the cyber charter school's IEPs, whether implemented in Student's home or in the private school.

It is beyond striking that without collecting at least preliminary behavioral/emotional/social data *or considering the extensive data the Parents provided through the recent private evaluation,* the District expected this child, with serious learning, sensory, and emotional issues, to enter a large public high school on the first day of the school year with minimal emotional supports after two years of being educated at home through a cyber charter school followed by two years of being educated in a very small specialized emotional support private school. The Parents have an older child and a younger child attending schools in the District. As revealed in a colloquy between the mother and the hearing officer, the Parents seemed genuinely interested in having Student attend the high school if the program consisted of small classes and a high level of emotional support. [NT 278-281] However, as discussed above, the program and placement the District offered this child was inappropriate under either a traditional FAPE standard or a modified intrastate transfer standard and accordingly the Parents have fulfilled their burden of proof on the first prong in this matter.  There was no probative evidence or argument presented that the private placement is not appropriate, or that equitable considerations alter the outcome of this case, and therefore an Order granting the relief the Parents seek is issued.

Order

It is hereby ordered that:

1.  The District denied Student a free, appropriate public education for the 2019-2020 school year.

2.  The private school is an appropriate placement for Student and remains the pendent placement throughout the duration of any appeals of this Order.

3.  There are no equitable considerations that would reduce or remove the District's obligation to reimburse the Parents for Student's tuition.

Any claims not specifically addressed by this decision and order are denied and dismissed.

*Linda M. Valentini, Psy.D., CHO*

October 27, 2019

Linda M. Valentini, Psy.D. CHO
Special Education Hearing Officer
NAHO Certified Hearing Official

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

West Chester Area School District

**DEFENDANTS**

S.O., by and through her parents, D.O. and C.O., and D.O. and C.O., in their own right

**(b)** County of Residence of First Listed Plaintiff   Chester
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Chester
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jason D. Fortenberry, Esquire - Sweet Stevens Katz & Williams LLP
331 East Butler Avenue, New Britain, PA 18901
215-345-9111

Attorneys *(If Known)*
Kathleen M. Metcalfe, Esquire - Raffaele & Associates LLC
1230 County Line Road, Bryn Mawr, PA 19010
610-922-4200

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | Slander Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability ☐ 368 Asbestos Personal | | New Drug Application | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine Injury Product | | ☐ 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer |
| of Veteran's Benefits | ☐ 350 Motor Vehicle ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | Product Liability ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Property Damage | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 196 Franchise | Injury ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| | ☐ 362 Personal Injury - Product Liability | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | Medical Malpractice | Leave Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 220 Foreclosure | ☐ 441 Voting ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Sentence | | 26 USC 7609 | Act/Review or Appeal of |
| ☐ 245 Tort Product Liability | Accommodations ☐ 530 General | | | Agency Decision |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of |
| | Employment **Other:** | ☐ 462 Naturalization Application | | State Statutes |
| | ☐ 446 Amer. w/Disabilities - ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other ☐ 550 Civil Rights | Actions | | |
| | ☒ 448 Education ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
IDEA of 2004, P.L. 108-446, 118 STAT. 2647-2808 (Dec 3, 2004), 20 U.S.C.§§1401-1482

Brief description of cause:
Appeal from an administrative decision

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   January 21, 2020

SIGNATURE OF ATTORNEY OF RECORD
Jason D. Fortenberry, Esquire

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 782 Springdale Drive, Exton, PA 19341 _____

Address of Defendant: _____ 507 Story Road, West Chester, PA 19380 _____

Place of Accident, Incident or Transaction: _____

---

*RELATED CASE, IF ANY:*

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: January 21, 2020        *Must sign here* (signature)        311397
*Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

| | |
|---|---|
| **A.**  *Federal Question Cases:* | **B.**  *Diversity Jurisdiction Cases:* |
| ☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts | ☐ 1.  Insurance Contract and Other Contracts |
| ☐ 2.  FELA | ☐ 2.  Airplane Personal Injury |
| ☐ 3.  Jones Act-Personal Injury | ☐ 3.  Assault, Defamation |
| ☐ 4.  Antitrust | ☐ 4.  Marine Personal Injury |
| ☐ 5.  Patent | ☐ 5.  Motor Vehicle Personal Injury |
| ☐ 6.  Labor-Management Relations | ☐ 6.  Other Personal Injury *(Please specify):* _____ |
| ☑ 7.  Civil Rights | ☐ 7.  Products Liability |
| ☐ 8.  Habeas Corpus | ☐ 8.  Products Liability – Asbestos |
| ☐ 9.  Securities Act(s) Cases | ☐ 9.  All other Diversity Cases |
| ☐ 10.  Social Security Review Cases |    *(Please specify):* _____ |
| ☐ 11.  All other Federal Question Cases | |
|    *(Please specify):* _____ | |

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Jason D. Fortenberry _____, counsel of record *or pro se plaintiff*, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: January 21, 2020        *Sign here if applicable* (signature)        311397
*Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 782 Springdale Drive, Exton, PA 19341 _____

Address of Defendant: _____ 507 Story Road, West Chester, PA 19380 _____

Place of Accident, Incident or Transaction: _____

---

*RELATED CASE, IF ANY:*

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?          Yes ☐    No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?          Yes ☐    No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?          Yes ☐    No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?          Yes ☐    No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: January 21, 2020    _____ *Must sign here* _____    311397
   *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

CIVIL: (Place a √ in one category only)

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
   *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
   *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Jason D. Fortenberry _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: January 21, 2020    _____ *Sign here if applicable* _____    311397
   *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | |
|---|---|
| WEST CHESTER AREA SCHOOL DISTRICT,<br>Plaintiff | : |
| v. | :     Civil Action No. _____ |
| S.O., by and through her parents,<br>D.O. and C.O., and<br>D.O. and C.O. in their own right,<br>Defendants | : |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus - Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security - Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration - Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos - Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management - Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management - Cases that do not fall into any one of the other tracks. (X)

1/21/2020     Jason D. Fortenberry, Esquire     Plaintiff
**Date**     **Attorney-at-law**     **Attorney for**

215-345-9111     215-348-1147     jfortenberry@sweetstevens.com
**Telephone**     **FAX Number**     **E-Mail Address**

(Civ. 660) 10/02